# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JOHN OSBOURNE p/k/a OZZY OSBOURNE, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| ANTHONY IOMMI, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**ECF CASE**

**Case No.: 09-cv-04947 (JGK)(RLE)**

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT ANTHONY IOMMI'S
## MOTION UNDER RULES 12(b)(6) AND 12(b)(3) TO DISMISS THE COMPLAINT

Howard J. Shire (HS 8892)
KENYON & KENYON LLP
One Broadway
New York, New York 10004
(212) 425-7200

*Attorneys for Plaintiff*
*John Osbourne p/k/a Ozzy Osbourne*

## TABLE OF CONTENTS

**INTRODUCTION**................................................................................................. 1

**RELEVANT BACKGROUND** ......................................................................... 3

**ARGUMENT** ..................................................................................................... 5

    I.     It Is Improper to Consider the 1980 Agreement on a Motion to Dismiss.............. 5

    II.    Even If the Court Were to Consider the 1980 Agreement, It Does Not Constitute a Valid Trademark Assignment ............................................. 9

    III.   Even If the 1980 Agreement Were a Valid Assignment of Trademark Rights by Osbourne, It Has Been Modified by Subsequent Written Agreement..................................................................................................... 10

    IV.   Even If the 1980 Agreement Were a Valid Assignment, It Has Been Novated by the Parties' Subsequent Course of Conduct ..................................... 12

    V.    Osbourne's Fourth Cause of Action Cannot Be Dismissed for Improper Venue ............................................................................................ 14

**CONCLUSION** ................................................................................................. 15

TABLE OF AUTHORITIES

**Cases**

*Auster Oil & Gas, Inc. v. Stream,* 764 F.2d 381 (5th Cir. 1985) ......................................5

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................6

*Brass v. Am. Film Techs., Inc.,* 987 F.2d 142 (2d Cir. 1993) ........................................7

*Brunette Mach. Works, Ltd. v. Kockum Indus.*, 406 U.S. 706 (1972)...................14, 15

*Cavu Releasing, LLC v. Fries*, 419 F. Supp. 2d 388 (S.D.N.Y. 2005) ...........................15

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)....................................6, 7

*Conley v. Gibson,* 355 U.S. 41 (1957) ............................................................................5

*Cortec Indus., Inc. v. Sum Holding L.P.*, 942 F.2d 42 (2d Cir. 1991) ............................8

*Cosmas v. Hassett*, 886 F.2d 8 (2d Cir. 1989) ...............................................................7

*Cowan v. Ernest Codelia*, *P.C.*, 149 F. Supp. 2d 67 (S.D.N.Y. 2001) ............................7

*Elbex Video Kabushiki Kaisha v. Taiwan Regular Elecs. Co.*, No. 93-CV-6160
    (KWM), 1994 U.S. Dist. LEXIS 6148 (S.D.N.Y. May 10, 1994)....................................14

*Goldman v. Belden*, 754 F.2d 1059 (2d Cir. 1985)................................................5, 7, 8

*Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir. 1986) ......................................5

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ..................................................................5

*Iqbal v. Hasty,* 490 F.3d 143 (2d Cir. 2007) .................................................................6

*Jasper v. Sony Music Entm't, Inc.*, 378 F. Supp. 334 (S.D.N.Y. 2005).........................8

*Liebowitz v. Elsevier Sci. Ltd.*, 927 F. Supp. 688 (S.D.N.Y. 1996).............................13

*Marshak v. Green*, 746 F.2d 927 (2d Cir. 1984).............................................................9

*Porter Pin Co. v. Sakin*, 112 Cal. App. 2d 760 (Cal. Ct. App. 1952)...........................12

*Rapoport v. Asia Elecs. Holding Co., Inc.*, 88 F. Supp. 2d 179 (S.D.N.Y. 2000) .........8

*RCA Records v. Hanks*, 548 F. Supp. 979 (S.D.N.Y. 1982)........................................15

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 784 F.2d 774
    (2d Cir. 1984)..............................................................................................................8

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .................................................................5, 6

*Secrest v. Sec. Nat'l Mortgage Loan Trust*, 167 Cal. App. 4th 544
    (Cal. App. 2008) ................................................................................................10

*Wells Fargo Bank v. Bank of America*, 32 Cal. App. 4th 424
    (Cal. Ct. App. 1995)..........................................................................................12

**Statutes**

15 U.S.C. § 1060.................................................................................................... 9

28 U.S.C. § 1391(d) ............................................................................................... 3

Cal. Civ. Code § 1530 .......................................................................................... 12

Cal. Civ. Code § 1531(1) ..................................................................................... 12

Cal. Civ. Code § 1698 .................................................................................... 10, 12

Fed. R. Civ. P. 12(b)(3).......................................................................... 1, 3, 14, 15

Fed. R. Civ. P. 12(b)(6)................................................................................. *passim*

**Other Authorities**

2 James William Moore *et al.*, *Moore's Federal Practice* § 12:34 ..................................5

3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18.................10, 13

5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*
    § 1357....................................................................................................................5

*Black's Law Dictionary* 84 .........................................................................................17

Plaintiff, John Osbourne p/k/a Ozzy Osbourne ("Osbourne"), by his attorneys, submits this Memorandum of Law in Opposition to Defendant Anthony Iommi's ("Iommi") motion under Rules 12(b)(6) and 12(b)(3) to dismiss the Complaint (the "Motion").  As explained in more detail below, Osbourne has sufficiently pled all claims (Counts I-IV) set forth in the Complaint and venue is proper in this Court.  The Motion plainly should be denied.

## <u>INTRODUCTION</u>

The Motion is not based on an assertion that Osbourne can prove no set of facts in support of his claims set forth in the Complaint.  To the contrary, the Motion requests that the Court improperly test the veracity of Osbourne's allegations by considering a long ago contract signed in 1980 by eight parties, most of which are not parties to this case (the "1980 Agreement"), and that was not referenced in or attached to the Complaint.  However, it would plainly be improper for the Court to consider this contract in the context of a 12(b)(6) motion, since it is outside the scope of the pleadings.

Essentially, Iommi argues that the Court must consider the 1980 Agreement in deciding the Motion, because Osbourne supposedly knew of and possessed the 1980 Agreement at the time of the Complaint.  Under Iommi's flawed logic, it is difficult to imagine any limitations to documents the court may consider when deciding a Rule 12(b)(6) motion—a defendant seeking a court's consideration of a document would be limited by only the documents he believes are within a plaintiff's possession or knowledge.  Moreover, Iommi's argument that a plaintiff's mere knowledge or possession of a document is enough to enable a court to consider it, has been specifically rejected by the Second Circuit Court of Appeals.

Second, even if the Court were to consider the 1980 Agreement, it is not a valid transfer of Osbourne's rights in and to the BLACK SABBATH mark. The 1980 Agreement is fatally flawed because it does not expressly transfer the goodwill symbolized by the BLACK SABBATH mark. Accordingly, it is an invalid transfer of trademark rights.[1]

Third, even if the Court were to consider the 1980 Agreement, Iommi conspicuously fails to mention the May 17, 1997 agreement entitled "Black Sabbath/Ozzy Osbourne Merchandise Agreement", to which Iommi and Osbourne are parties (the "1997 Black Sabbath Agreement"). This agreement was signed when Osbourne rejoined Black Sabbath and effectively modifies the 1980 Agreement, which was signed when Osbourne left the group. As discussed in further detail below, under the 1997 Black Sabbath Agreement, Osbourne is a co-licensor with Iommi, of *inter alia*, the BLACK SABBATH mark, and receives an equal share of royalty payments based on sales of licensed BLACK SABBATH merchandise.

Fourth, the parties' conduct from 1997 onward novates or at least significantly modifies the 1980 Agreement. For example, the payment of royalties to Osbourne for Signatures Network, Inc.'s ("Signatures") use of the BLACK SABBATH mark, authorized by both Osbourne and Iommi in the 1997 Black Sabbath Agreement and its subsequent amendments, clearly evidences an intention to extinguish the 1980 Agreement, at least to the extent that the Agreement purports to assign Osbourne's rights in the trademark. In addition, Osbourne has controlled the nature and quality of BLACK SABBATH goods and services from 1997 onward, which is the *sine qua non* of trademark ownership.

---

[1]    Of course, the BLACK SABBATH trademark registration which is at issue in this case did not even exist in 1980, so this "assignment" could not have been a transfer of this registration.

Lastly, Iommi's argument that Osbourne's right of publicity claim (Count IV) should be dismissed under Rule 12(b)(3) due to improper venue makes no sense. This district is clearly a proper venue under at least 28 U.S.C. § 1391(d). Iommi is an alien, as he is a resident and citizen of the United Kingdom. Therefore venue is proper in any district court, including this one.

<u>**RELEVANT BACKGROUND**</u>

Osbourne for many years has been the lead singer and most recognizable member of the legendary rock band Black Sabbath. With Osbourne as the voice and face of Black Sabbath, veritably synonymous with Black Sabbath, the band was immensely successful, selling over 100 million albums in total, with each individual album certified platinum or gold. (Complaint, ¶ 1). When Osbourne did not perform on Black Sabbath albums released from 1980 to 1996, there was significantly less revenue derived from the sales of these albums, but during this period, prior Black Sabbath albums featuring Osbourne's lead vocals, and whose quality he controlled, sold extensively. (Complaint, ¶ 9).

When Osbourne rejoined Black Sabbath in 1997, the band recaptured its extraordinary success, headlining the 1997 Ozzfest tour and selling over 1 million copies of the live album "Reunion". (Complaint, ¶ 11). Since 1997, Osbourne has exercised control of the nature and quality of goods and services marketed under the BLACK SABBATH mark, from concert tours to merchandise, thereby developing invaluable goodwill in the mark. (Complaint, ¶¶ 4, 12, 21). These sales have generated millions of dollars, and rock fans worldwide recognize Osbourne as the driving force behind Black Sabbath. During this period, Iommi has had no significant control or input regarding the quality of the BLACK SABBATH goods or services. (Complaint, ¶¶ 12, 21).

In recognition of Osbourne's joint ownership of the BLACK SABBATH mark, Iommi has agreed since 1997 to share royalties from the sales of BLACK SABBATH merchandise on a "50/50" basis with Osbourne. (Complaint, ¶¶ 16-17). Moreover, Iommi, without any objection, has known for years of Osbourne's ownership of the official Black Sabbath website (blacksabbath.com) and the website's sale of BLACK SABBATH merchandise. (Complaint, ¶ 22). Since Osbourne rejoined the Black Sabbath band in 1997, he has performed in all Black Sabbath concerts. Without Osbourne, Iommi and former Black Sabbath band mates perform concert tours under the mark "Heaven and Hell," not "Black Sabbath". (*Id.*). This activity at least suggests that Iommi believes that he is not entitled to use the BLACK SABBATH mark without Osbourne's consent or participation and that he regards Osbourne as a co-owner of the trademark.

In or around 2000, without Osbourne's knowledge or consent, Iommi falsely asserted to the United States Patent and Trademark Office that "to the best of his knowledge . . . no other person . . . has the right to use [the BLACK SABBATH mark] in commerce," in order to obtain U.S. Reg. No. 2,399,391. (Complaint, ¶¶ 2, 14-15).

In 2008, as Osbourne and Iommi were negotiating a further amendment of their long-standing exclusive license agreement with Signatures, Iommi sent a protest letter to Signatures and filed a complaint in this district court claiming sole ownership of the BLACK SABBATH mark, alleging Signatures infringed upon Iommi's exclusive rights to the mark, and demanding that Signatures stop using the mark. (Complaint, ¶¶ 16, 18, 20). In response, Signatures ceased all sales of BLACK SABBATH merchandise, thus derailing negotiations and the parties' longstanding relationship with Signatures. (Complaint, ¶¶ 18, 23-24). As a result, Osbourne has lost, and is continuing to lose royalties from such sales that he would have otherwise received

from Signatures, but for Iommi's actions and false claims of ownership of the BLACK SABBATH trademark.  (Complaint, ¶ 24).

## ARGUMENT

### I.    It Is Improper to Consider the 1980 Agreement on a Motion to Dismiss

It is well-settled that the party moving for dismissal under Rule 12(b)(6) has the burden of proving that no claim has been stated.  2 James William Moore *et al.*, *Moore's Federal Practice* § 12:34 (3d ed. 2009).  Since Rule 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," there is "a powerful presumption against rejecting pleadings for failure to state a claim."  *Auster Oil & Gas, Inc. v. Stream,* 764 F.2d 381, 386 (5th Cir. 1985); *see also Hall v. City of Santa Barbara,* 833 F.2d 1270, 1274 (9th Cir. 1986) ("It is axiomatic that 'the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'") (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (1969)).

Dismissal is not warranted "unless it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Goldman v. Belden,* 754 F.2d 1059, 1065 (2d Cir. 1985) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957) (footnote omitted)).  As Iommi concedes, in deciding a 12(b)(6) motion all allegations in the complaint are accepted as true and all reasonable inferences must be drawn in the plaintiff's favor.  (Iommi's Memorandum of Law in Support of Motion to Dismiss ("Memo"), p. 4).

On a Rule 12(b)(6) dismissal motion, the issue is not whether a plaintiff will ultimately prevail, but whether it is entitled to offer evidence to support its claims.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).  Although mere labels, conclusions and formulaic recitations of a claim's elements are

insufficient, the Rules require "only enough facts to state a claim to relief that is plausible on its face," assuming all allegations are true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Iqbal v. Hasty,* 490 F.3d 143, 157-158 (2d Cir. 2007) (*Twombly* requires courts to apply the flexible "plausibility standard"). Indeed, a well-pled complaint may proceed even if actual proof of those facts is improbable, and "a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556, quoting *Scheuer*, 416 U.S. at 236.

Iommi relies on the 1980 Agreement as the lone basis to summarily dismiss Osbourne's well-pled complaint. To justify his improper introduction of the 1980 Agreement, Iommi relies upon a fundamental misunderstanding of when a court may consider a document in deciding a motion to dismiss. Iommi incorrectly states: "in determining whether to dismiss a complaint pursuant to Rule 12(b)(6), a court may consider documents . . . the plaintiff relied on in bringing suit, or that the plaintiff possessed and knew of when bringing suit, as well as matters of which judicial notice may be taken." (Memo, p. 4).

Here, there is no indication that Osbourne relied at all on the 1980 Agreement in bringing suit, as it is nowhere mentioned in the Complaint. Furthermore, there is no legal support for the proposition that a plaintiff's mere knowledge, possession, or notice of a document means that it may be considered by a court in this context. To the contrary, this argument has been squarely rejected by the Second Circuit. In *Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002), the Second Circuit, in vacating a district court's dismissal under Rule 12(b)(6), held that "[b]ecause this standard [of what may be considered in a 12(b)(6) motion] has been misinterpreted on occasion, we reiterate here that a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; **mere notice or possession is not enough**." *Id.* at 153

(emphasis added).[2]  Accordingly, Iommi's unsupported allegation that Osbourne knew of and was in possession of the 1980 Agreement cannot, as a matter of law, permit the Court to consider this agreement in deciding the Motion.[3]

The Second Circuit also has squarely rejected the consideration of documents which were in the possession of and known to a plaintiff, even if they were quoted in the complaint (which Osbourne plainly has not done).  *Goldman*, 754 F.2d at 1065-66; *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (error for district court to consider documents which were briefly excerpted in the complaint, since limited quotation "does not constitute incorporation by reference").  Here, the 1980 Agreement is not attached to the Complaint, incorporated by reference, or even quoted in the Complaint.  Therefore, the argument for not considering the 1980 Agreement is even stronger here than in *Goldman* or *Cosmas*.

In *Chambers*, the Second Circuit also ruled that when a document is not incorporated in the complaint by reference, the court may only consider it "where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint."  *Chambers*, 282 F.3d at 153 (citation omitted).  Thus, Iommi must show that the Complaint relies "heavily" upon the terms of the 1980 Agreement so that it is "integral" to the Complaint.  However, Iommi cannot and does not even attempt to make this showing.  To the contrary, Iommi *implies* that just one sentence in the 12-page Complaint, namely Osbourne's allegation that he did not validly assign to Iommi his rights in or to the BLACK SABBATH mark or to Osbourne's name, image,

---

[2]    The other two cases that Iommi cites in support of this argument namely, *Cowan v. Ernest Codelia, P.C.*, 149 F. Supp. 2d 67, 70 (S.D.N.Y. 2001) (Koeltl, J.) and *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993), predate *Chambers* and in any event do not help Iommi at all.  *Cowan* and *Brass* both held that the documents in question had to have been "relied on in bringing suit".

[3]    Even if Iommi were correct that Osbourne's mere possession and knowledge of the agreement were sufficient, he has presented no evidence that Osbourne currently possesses and knows of an agreement that was signed nearly 30 years ago.

or likeness[4] (Complaint, ¶ 10), somehow mandates that the Court consider the 1980 Agreement. (Memo, p. 4). But Osbourne's claims set forth in the Complaint clearly do not rely, let alone rely "heavily", on the 1980 Agreement. This agreement is scarcely "integral" to Osbourne's pleading. Iommi does not even allege otherwise.[5]

For purposes of the Motion, the Court must take all factual allegations in the Complaint as true. Accordingly, it would be highly improper at this juncture to test the truth of any of Osbourne's allegations, or consider the 1980 Agreement in any way. "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman*, 754 F.2d 1059 at 1067 (citing *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 784 F.2d 774, 779 (2d Cir. 1984)). Since the sole basis for the Motion is the 1980 Agreement, and this agreement should not be considered, the Motion should be denied.

---

[4]     Iommi does not allege, because he clearly cannot, that the 1980 Agreement constitutes an assignment of Ozzy's name, image or likeness, which are the other allegations in this sentence and are the subject of Count IV of the Complaint.

[5]     Iommi's cases to support his argument that the 1980 Agreement should be considered because Osbourne supposedly concealed it, or it supposedly contradicts Osbourne's allegations, are factually distinguished. In *Cortec Industries, Inc. v. Sum Holding L.P.*, 942 F.2d 42, 44 (2d Cir. 1991), the documents in question were relied upon by the plaintiffs in drafting their complaint and were integral to their claim, even though they were not attached to the complaint or incorporated by reference. In *Jasper v. Sony Music Entertainment, Inc.*, 378 F. Supp. 334, 338 (S.D.N.Y. 2005), the plaintiff clearly had incorporated the documents at issue by reference, by affirmatively pleading them in the complaint. In *Rapoport v. Asia Electronics Holding Co., Inc.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000), the amended complaint relied "exclusively" on statements contained in the documents at issue, which were heavily quoted in the pleading. None of these circumstances is present here. The Complaint does not rely on the 1980 Agreement, let alone rely "exclusively" on it, incorporate it by reference, or quote from it at all. In sum, Iommi's cases are inapposite.

## II.    Even If the Court Were to Consider the 1980 Agreement, It Does Not Constitute a Valid Trademark Assignment

Even if the Court were to consider the 1980 Agreement, nowhere in the Agreement does Osbourne transfer the goodwill symbolized by the BLACK SABBATH mark.  It is well-settled law that the omission of a specific transfer of goodwill is fatal to a trademark assignment.  3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 18:2, 18:17 (4th ed. 2009); *Marshak v. Green*, 746 F.2d 927 (2d Cir. 1984) (sale of a musical group's name held void where it did not include the goodwill symbolized by the name).[6]  "In understanding the law regarding assignment of trademarks, one must start with the premise that a trademark is merely a symbol of good will."  *McCarthy* at § 18:2.  Without goodwill itself, the trademark symbolizes nothing.  *Id.*  As the Second Circuit stated, "A trade name or mark is merely a symbol of goodwill; it has no independent significance apart from the goodwill it symbolizes. . . .  [A] trademark cannot be sold or assigned apart from the goodwill it symbolizes."  *Marshak*, 746 F.2d at 929.  The pertinent part of the 1980 Agreement which purports to transfer Osbourne's rights in and to the BLACK SABBATH mark, namely Paragraph 12, does not include the requisite language concerning the transfer of the goodwill symbolized by the mark:

> OSBOURNE and MONOWISE hereby assign and transfer to BLACK SABBATH any and all rights of any kind or nature that they have or have had in the name "BLACK SABBATH".[7]

---

[6]    The U.S. Trademark Act provides that an assignment of a registered or pending trademark must include the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark. 15 U.S.C. § 1060.

[7]    The Second Circuit in *Marshak* held that similar language in an order directing a sale of a defendant's trademark, namely a musical group's name, constituted an invalid assignment: "'to attach whatever proprietary interest the judgment debtor, David Rick, may have or claim to have in the registered name VITO AND THE SALUTATIONS and to sell same at public auction forthwith to satisfy plaintiff's [Marshak's] judgment against said defendant [Rick]. . . .'"  746 F.2d at 928-929 (sale of trademark was set aside because assignment failed to include goodwill symbolized by the trademark).

Thus, on its face, the 1980 Agreement fails to mention transfer of goodwill.  Accordingly, even if the Court were to consider the 1980 Agreement, it is not a valid trademark assignment so it can in no way justify dismissal of the Complaint.

Finally, given the definition of BLACK SABBATH in the 1980 Agreement, even if Osbourne were deemed to have validly assigned his trademark ownership, he did not assign it to Iommi.  Instead, he would have assigned it to six different parties—five others, plus Iommi. There is nothing of record indicating what, if anything, became of the purported ownership interests of all these other parties.[8]

### III.    Even If the 1980 Agreement Were a Valid Assignment of Trademark Rights by Osbourne, It Has Been Modified by Subsequent Written Agreement

Even if the Court were to find the 1980 Agreement to be a valid trademark assignment, under California law[9] a contract may be modified by, *inter alia*, a subsequent written agreement of the parties.  Cal. Civ. Code § 1698 ("A contract in writing may be modified by a contract in writing"); *Secrest v. Sec. Nat'l Mortgage Loan Trust*, 167 Cal. App. 4th 544, 553 (Cal. App. 2008).  Indeed, Iommi concedes that the 1980 Agreement can be modified or terminated by a subsequent written agreement.  (Memo, p. 5).  If the Court were to consider the 1980 Agreement, Osbourne respectfully requests that the Court also consider the 1997 Black Sabbath Agreement and the three amendments thereto.  (Declaration of Dell Furano ("Furano Decl."), Exs. A-D).[10]

---

[8]      The five other parties are William Thomas Ward, Terence Michael Butler, Gimcastle Ltd., Thurslehead Ltd., and Warnickshire Management, Inc.

[9]      The 1980 Agreement provides that California law governs the agreement.

[10]     Osbourne, of course, recognizes that if the Court does not exclude matters outside the pleadings (such as the 1980 Agreement and the 1997 Black Sabbath Agreement), the Motion may be treated as one for summary judgment under Rule 56, in which case, all parties must be given a reasonable opportunity to present pertinent evidence.  Fed. R. Civ. 12(d).  Osbourne respectfully requests that if the Court were to consider the 1980 Agreement, and treat the Motion

The 1997 Black Sabbath Agreement was a license from Iommi, Osbourne and Geezer Butler[11] to Signatures for use of, among other items, the "name and trademarks of Black Sabbath" and the "trademarks . . . related to Black Sabbath through the band's entire career. . . ." (Furano Decl., Ex. A, ¶¶ 1(a) and 1(b)).  All royalties and advances paid under this license are divided equally among Iommi, Osbourne and Butler.  (*Id.*, ¶ 1).  This license agreement was entered into when Osbourne rejoined Black Sabbath and reflects the fact that he was rejoining the group (which in and of itself clearly amounts to an amendment of the 1980 Agreement, which had prohibited Osbourne from performing under the BLACK SABBATH mark) and was a co-owner of the BLACK SABBATH mark, entitled to precisely the same royalties as Iommi for exploitation of the trademark.  There have been three amendments to the 1997 Black Sabbath Agreement (Furano Decl., Exs. B-D), the most recent of which is dated May 2, 2005 (Furano Decl., Ex. D), which was signed by a company named Bluefame Limited ("Bluefame") and by Osbourne on behalf of his company Monowise Limited ("Monowise").[12]  Monowise and Bluefame are explicitly identified in this amendment as "Licensor" and share equally in the royalties from the sales of licensed BLACK SABBATH merchandise.  (Furano Decl., Ex. D).  Signatures, the licensee, recognizes Osbourne as a co-owner and co-licensor of the BLACK SABBATH mark.  (Furano Decl., ¶ 9).  Furthermore, the fact that Osbourne and Monowise are parties to agreements pursuant to which they are licensor of the BLACK SABBATH trademark necessarily means they have an ownership interest in the trademark, since it is axiomatic that a party cannot grant a license to use a trademark unless it has an ownership interest in that

---

as one for summary judgment, that he be granted a reasonable opportunity to take discovery in support of his defense.  As the Court knows, this case is in its infancy and no discovery has been permitted or taken.

[11]    Geezer Butler has also been a member of the Black Sabbath band.

[12]    Bluefame is apparently a company owned or controlled by Iommi.  Monowise is a company owned and controlled by Osbourne.

trademark. *See* 3 *McCarthy on Trademarks and Unfair Competition* § 18:51 (4th ed. 2009). At the bare minimum, these agreements preclude the Court from according the 1980 Agreement, at least at this stage, the preclusive effect Iommi desires.

In sum, the written provisions of the 1997 Black Sabbath Agreement and its amendments evidence that even if Osbourne had transferred his rights in and to the BLACK SABBATH mark in 1980, by 1997 Iommi and Osbourne had agreed to jointly own and license the BLACK SABBATH mark.

**IV.    Even If the 1980 Agreement Were a Valid Assignment,
It Has Been Novated by the Parties' Subsequent Course of Conduct**

Under California law, which governs the 1980 Agreement, written agreements which only allow for written modification of their provision may still be novated by oral agreements or conduct, that is, "'the substitute of a new obligation for an existing one.'" *Wells Fargo Bank v. Bank of America*, 32 Cal. App. 4th 424, 431 (Cal. Ct. App. 1995) (quoting Cal. Civ. Code § 1530); *see also* California Civil Code § 1698(d) ("Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement, rescission of a written contract by an oral agreement, waiver of a provision of a written contract, or oral independent collateral contracts.") Novation may be accomplished . . . "by the substitution of a new obligation between the same parties, with intent to extinguish the old obligation[.]" *Wells Fargo Bank*, 32 Cal. App. 4th at 431; Cal. Civ. Code § 1531(1). Courts may also take into consideration the conduct of the parties in determining whether an agreement was novated. *Porter Pin Co. v. Sakin*, 247 P.2d 81 (Cal. Ct. App. 1952). Assuming, *arguendo*, that the 1980 Agreement were a valid assignment, and were not modified by the 1997 Black Sabbath Agreement and its amendments, it has been modified by the parties' subsequent conduct.

First, as set forth more fully above, for over a decade, with Iommi's full knowledge and consent, Signatures has paid royalties to Osbourne and Iommi on an equal basis with respect to its licensed sales of BLACK SABBATH merchandise. (Complaint, ¶ 17). This conduct evidences an intention to extinguish any portion of the 1980 Agreement which purported to transfer Osbourne's rights in and to the mark. Signatures, the licensee of the BLACK SABBATH mark, regarded Osbourne as a co-owner and co-licensor of the trademark. (Furano Decl., ¶ 9). Further, Iommi knowingly consented to Signatures treating Osbourne as a co-owner of the BLACK SABBATH mark, by entering into agreements whereby Osbourne and Iommi were paid equal royalties. (Furano Decl., Exs. A-D). In sum, Iommi and Signatures both treated Osbourne as a co-owner of the BLACK SABBATH mark. A party with no ownership rights to a mark would not be designated as a "Licensor" of the mark and would not receive royalty payments from a licensee exploiting this mark; certainly not with the knowledge and consent of the party to whom he allegedly assigned these rights.

Second, for over a decade, Osbourne, either himself or though persons acting on his behalf, and with Iommi's knowledge, has exercised control with respect to the nature and quality of goods and services sold under and in connection with the BLACK SABBATH mark, from concert tours to merchandise. (Complaint, ¶ 12; Furano Decl., ¶ 10). This is critical, because whoever controls the quality of goods or services marketed under a trademark owns that trademark. *Liebowitz v. Elsevier Sci. Ltd.*, 927 F. Supp. 688, 696 (S.D.N.Y. 1996). In contrast, Iommi has had no meaningful input with respect to quality of the BLACK SABBATH goods or services. (Complaint, ¶ 12; Furano Decl., ¶ 9). Osbourne's long-standing and continuous exercise of quality control over the BLACK SABBATH mark is wholly inconsistent with his

13

alleged relinquishment of trademark rights in the 1980 Agreement and evidences his ownership interest in the mark.

## V.    Osbourne's Fourth Cause of Action Cannot Be Dismissed for Improper Venue

Iommi argues that Osbourne's right of publicity claim should be dismissed under Rule 12(b)(3) if the Court dismisses Counts I-III, because "[t]o the extent Osbourne asserts that the Court has diversity jurisdiction over the [state] claim, venue is improper since neither party is a resident of New York, both Signatures [a non-party to this venue] and Osbourne are residents of California, and the claim is based on California law."  (Memo, p. 8).  This meritless argument overlooks the fact that Iommi is a citizen and a resident of the United Kingdom.

Section 1391(d) provides that "[a]n alien may be sued in any district."  The Supreme Court has held that Section 1391(d) "is properly regarded, not as a venue restriction at all, but rather as a declaration of the long-established rule that suits against aliens are wholly outside the operation of all the federal venue laws, general and special."  *Brunette Mach. Works, Ltd. v. Kockum Indus.*, 406 U.S. 706, 714 (1972); *see Elbex Video Kabushiki Kaisha v. Taiwan Regular Elecs. Co.*, No. 93-CV-6160 (KWM), 1994 U.S. Dist. LEXIS 6148, *11 (S.D.N.Y. May 10, 1994) (rejecting a defendant corporation's, a resident of Taiwan, motion to dismiss for improper venue because "venue is proper as to an alien in any judicial district pursuant to 28 U.S.C. § 1391(d).").  Thus, suits against aliens are free from venue restrictions and subject only to the requirements of service of process.  *Brunette Machine Works*, 406 U.S. at 708 (venue for alien subject to only requirement of service of process).

"In the United States, an alien is a person who was born outside the jurisdiction of the United States, who is subject to some foreign government, and who has not been naturalized under U.S. law."  *Black's Law Dictionary* 84 (9th ed. 2009).  Osbourne has alleged that Iommi

14

resides in the United Kingdom. (Complaint, ¶ 7). Iommi has admitted to the United States Patent and Trademark Office that he is a citizen of the United Kingdom. (Complaint, Ex. A). For the purposes of deciding a Rule 12(b)(3) venue motion, "the court must accept the facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Cavu Releasing, LLC v. Fries*, 419 F. Supp. 2d 388, 394 (S.D.N.Y. 2005) (denying defendants' motion to dismiss for improper venue). Osbourne has sufficiently alleged that Iommi is an alien. Iommi does not (and cannot) deny this allegation. "Once alienage is established, Section 1391(d) takes precedence over all other venue provisions." *RCA Records v. Hanks*, 548 F. Supp. 979, 982 (S.D.N.Y. 1982) (citing *Brunette Machine Works*, 406 U.S. at 714). Since Iommi undisputedly is an alien, venue is clearly proper under Section 1391(d).[13]

## CONCLUSION

For the reasons set forth herein, Plaintiff respectfully requests that the Court deny the Motion in its entirety.

Dated: August 17, 2009                              KENYON & KENYON LLP


                                        By:    s/ Howard J. Shire
                                               Howard J. Shire (HS 8892)
                                               One Broadway
                                               New York, New York 10004
                                               (212) 425-7200

                                               Attorneys for Plaintiff
                                               John Osbourne p/k/a Ozzy Osbourne

---

[13]    Furthermore, Iommi has routinely performed in New York over the years and indeed is scheduled to perform in New York City on August 25, 2009, as part of the Heaven & Hell group. Heaven and Hell, 2009 U.S. Tour Dates, http://www.heavenandhelllive.com/site/?page_id=2 (last visited Aug. 13, 2009).