UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

JOHN OSBOURNE p/k/a OZZY OSBOURNE,

      Plaintiff,

   v.

ANTHONY IOMMI

      Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

No. 09 Civ. 04947 (JGK)

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

  Defendant Anthony Iommi ("Iommi"), by and through his attorneys DeVore & DeMarco LLP, hereby submits the following Answer, Affirmative Defenses, and Counterclaims in response to Plaintiff John Osbourne's ("Osbourne") Complaint.

## NATURE OF THE ACTION

  1. Iommi admits that this dispute concerns ownership of the one of the most famous and valuable marks in the history of rock and roll, namely BLACK SABBATH. Iommi also admits that Black Sabbath is one of the most financially and critically successful bands of all time, has sold over 100 million albums worldwide, attained a reputation as a band that defined the "heavy metal" genre, and was inducted into the Rock and Roll Hall of Fame. Iommi further admits that for some period of time Osbourne was the lead singer of the band. Iommi denies the remaining allegations in Paragraph 1.

  2. Iommi admits that he owns the exclusive rights to the mark BLACK SABBATH under a federal trademark registration, U.S. Reg. No. 2,399,391. Iommi denies the remaining allegations in Paragraph 2.

3. Iommi admits this is an action for declaratory judgment and denies the remaining allegations in Paragraph 3.

4. Iommi denies the allegations in Paragraph 4.

## JURISDICTION AND VENUE

5. The Paragraph contains no averment of fact as to Iommi and therefore no response is required. Further, the Paragraph calls for legal conclusions to which no response is required.

## PARTIES

6. Iommi admits the allegations in Paragraph 6.

7. Iommi admits the allegations in Paragraph 7.

## BACKGROUND

8. Iommi admits that Black Sabbath's revolutionary sound was immensely successful and that, from 1969 to 1979, the band released the following successful and critically acclaimed albums: "*Black Sabbath*" (1970); "*Paranoid*" (1970); "*Master of Reality*"; "*Black Sabbath, Vol. 4*" (1972); and "*Sabbath Bloody Sabbath*" (1973). Iommi further admits that a number of Black Sabbath albums have been certified platinum (*i.e.*, selling over 1 million copies) or gold (*i.e.*, selling over 500,000 copies) in the United States, and that the album "*Paranoid*" was certified quad platinum (*i.e.*, selling over 4 million copies) and recognized by *Time* Magazine as one of the Top 100 Albums of All Time. Iommi denies the remaining allegations in Paragraph 8.

9. Iommi admits that Osbourne did not perform with Black Sabbath from 1980-1996. Iommi admits that Black Sabbath albums recorded prior to 1980 have been extensively sold in the United States and elsewhere. Iommi denies the remaining allegations in Paragraph 9.

10. Iommi denies the allegations in Paragraph 10.

11. Iommi admits that Osbourne agreed to play with Black Sabbath as the headline act at the Ozzfest hard rock festival managed by Osbourne's wife/manager Sharon Osbourne. Iommi also admits that Black Sabbath released a live album in 1998 entitled "*Reunion*" that included Osbourne as lead vocalist and that sold over 1 million copies. The remaining allegations in Paragraph 11 contain rhetorical statements to which no response is required.

12. Iommi denies the allegations in Paragraph 12.

13. Iommi denies the allegations in Paragraph 13.

## JUSTICIABLE CONTROVERSY

14. Iommi admits that he registered the BLACK SABBATH mark with the respective Trademark Offices in the United States, the United Kingdom, and the European Union. Iommi also admits that in the United States, the USPTO issued Reg. No. 2,399,391 to Iommi for the mark BLACK SABBATH on October 31, 2000. Iommi denies the remaining allegations in Paragraph 14.

15. Iommi denies that he made a false representation to the USPTO. Iommi admits that he affirmed in an application for trademark registration for the BLACK SABBATH mark that to the best of his knowledge no other person has the right to use the BLACK SABBATH mark in commerce. The sworn declaration dated March 1, 1999, attached to Osbourne's Complaint speaks for itself and therefore no response is required.

16. Iommi denies that Osbourne has "co-ownership" of the BLACK SABBATH mark. Iommi admits that he sent a letter to third-party licensee, Signatures Networks, demanding it to stop manufacturing, distributing, and selling merchandise bearing the BLACK SABBATH mark, but denies that he falsely claimed that he was the sole owner of the BLACK

SABBATH mark. Iommi lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16.

17. Iommi denies that Osbourne has joint ownership of the BLACK SABBATH mark. Iommi admits that he periodically agreed to pay Osbourne a portion of royalties derived from certain exploitations of the BLACK SABBATH mark by Signatures. Iommi denies the remaining allegations in Paragraph 17.

18. The Paragraph contains rhetorical statements to which no response is required.

19. The letter dated April 21, 2008, attached to Osbourne's Complaint speaks for itself and therefore no response is required.

20. Iommi admits that on or about December 16, 2008, he filed a complaint in this District against Signatures and Live Nation, Inc., alleging that Signatures' use of the BLACK SABBATH mark infringed upon Iommi's exclusive rights in and to the mark. Iommi denies the remaining allegations in Paragraph 20.

21. The letter dated January 26, 2009, attached to Osbourne's Complaint, speaks for itself and therefore no response is required.

22. Iommi denies that has never objected to the ownership of the www.blacksabbath.com website or the sale of BLACK SABBATH merchandise through this website. Iommi admits that he has periodically performed in concert tours, with other bands, including "Heaven and Hell," with other members of Black Sabbath. Iommi lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 22.

23. Iommi denies that he has falsely claimed that he alone has exclusive rights in and to the BLACK SABBATH mark. Iommi denies the remaining allegations in Paragraph 23.

24. Iommi denies the allegations in Paragraph 24.

25. Iommi admits that he entered into a confidential settlement with Signatures. Iommi denies the remaining allegations in Paragraph 25.

26. Iommi denies the allegations in Paragraph 26.

27. The Paragraph calls for legal conclusions to which no response is required.

## COUNT I
## DECLARATORY JUDGMENT OF
## JOINT OWNERSHIP OF THE BLACK SABBATH MARK

28. Iommi incorporates and reallages Paragraphs 1-27 of this Answer.

29. The Paragraph calls for legal conclusions to which no response is required.

30. Iommi denies the allegations in Paragraph 30.

31. Iommi admits the allegations in Paragraph 31.

32. Iommi denies the allegations in Paragraph 32.

## COUNT II
## CANCELLATION OF TRADMARK REGISTRATION

33. Iommi incorporates and reallages Paragraphs 1-32 of this Answer.

34. Iommi denies that he made a false representation to the USPTO. Iommi admits that he affirmed in an application for trademark registration for the BLACK SABBATH mark that to the best of his knowledge no other person has the right to use the BLACK SABBATH mark in commerce.

35. Iommi denies the allegations in Paragraph 35.

36. Iommi admits that the USPTO issued U.S. Trademark Reg. 2,399,391 for BLACK SABBATH to Iommi. Iommi denies the remaining allegations in Paragraph 36.

37. Iommi denies the allegations in Paragraph 37.

## COUNT III
## DECLARATORY JUDGMENT OF MONIES OWED TO OZZY

38. Iommi incorporates and reallages Paragraphs 1-37 of this Answer.

39. Iommi denies the allegations in Paragraph 39.

40. Iommi denies the allegations in Paragraph 40.

## COUNT IV
## MISAPPROPRIATION OF OZZY'S RIGHT OF PUBLICITY

41. Iommi incorporates and reallages Paragraphs 1-40 of this Answer.

42. Iommi denies the allegations in Paragraph 42.

43. Iommi lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43.

44. Iommi denies the allegations in Paragraph 44.

45. Iommi denies the allegations in Paragraph 45.

## AFFIRMATIVE DEFENSES

1. The Complaint fails to set forth a claim upon which relief may be granted.

2. Osbourne's claims to rights in the BLACK SABBATH mark are barred under contract. Osbourne signed a binding separation agreement ("Separation Agreement") upon his departure from Black Sabbath on June 30, 1980. Under the terms of that Agreement, Osbourne and his company Monowise, Ltd. ("Monowise") knowingly and voluntarily assigned and transfered "any and all rights of any kind or nature that they have or have had in the name 'BLACK SABBATH' . . . . OSBOURNE further agree[d] that he will not hereafter, directly or indirectly, use, permit, or authorize the use of the name 'BLACK SABBATH' or any part of it or any similar name in connection with any activities in and throughout the entertainment industry." (A true and correct copy of the Separation Agreement is attached as Exhibit A.)

3. Osbourne's claims are barred in whole or in part by his failure to join indispensible parties, namely Signatures, Live Nation, and/or the other original members of the Black Sabbath band, Terence "Geezer" Butler ("Butler") and Bill Ward ("Ward").

4. Osbourne's claims are barred in whole or in part by his own contract(s) with Signatures and/or Live Nation. Specifically, upon information and belief, Osbourne entered into a separate agreement(s) with Signatures and/or Live Nation for royalties from the sale of merchandise bearing Osbourne's name, image, or likeness. Iommi is not a party to this agreement(s).

5. Osbourne's claims are barred in whole or in part by his own admission that Iommi owns the BLACK SABBATH mark. In or around 2006, in an interview published in Billboard magazine and/or Billboard.com, Osbourne acknowledged that "Tony owns the name Black Sabbath."

6. Osbourne's claims are barred in whole or in part by the doctrine of release.

7. Osbourne's claims are barred in whole or in part by the doctrine of license.

8. Osbourne's claims are barred in whole or in part by the doctrine of estoppel.

9. Osbourne's claims are barred in whole or in part by the doctrine of waiver.

10. Osbourne's claims are barred in whole or in part by the doctrine of laches.

11. Osbourne's claims are barred in whole or in part by the doctrine of acquiescence.

12. Osbourne's claims are barred in whole or in part by fraud, mistake and/or the doctrine of unclean hands.

13. Osbourne's claims are barred in whole or in part by the statute of frauds.

14. Osbourne's claims are barred in whole or in part by the applicable statute of limitations.

# COUNTERCLAIMS

Defendant and Counterclaimant Iommi, by and through his attorneys DeVore & DeMarco LLP, hereby counterclaims against Plaintiff and Counter-Defendant Osbourne as follows:

## PARTIES

1. Iommi is a co-founder of the rock band Black Sabbath, and has been the one constant and only continuous original member of the band. He is the sole registered owner of the Black Sabbath trademark and resides in the United Kingdom.

2. Osbourne co-founded the rock band Black Sabbath, but voluntarily left the band in 1980. Upon information and belief, Osbourne resides in California.

## JURISDICTION AND VENUE

3. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 2201-02.

4. Venue in this District is proper under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### Iommi's Role in Black Sabbath

1. Black Sabbath was formed in 1968 in Birmingham, United Kingdom, by Iommi, Osbourne, Terence "Geezer" Butler ("Butler"), and Bill Ward ("Ward").

2. In the over forty years since its founding, Black Sabbath has enjoyed extraordinary international success.

3. Throughout the entire history of Black Sabbath, Iommi has been the only continuous original member of the band.

4. Since 1968, Black Sabbath has released at least twenty-three studio and live recording albums, excluding compilations of previously recorded materials.

5. Osbourne performed on less than eleven of these studio and live recording albums, excluding compilations of previously recorded materials.

6. Iommi is the only band member who has performed on every single Black Sabbath album ever released.

7. As the only continuous original member of Black Sabbath, Iommi has served as the group's leader and principal representative.

**Osbourne's Departure from Black Sabbath**

8. After recording eight studio albums and performing with the band, Osbourne voluntarily left Black Sabbath in or around 1979.

9. In connection with his voluntary separation from the band, Osbourne signed a Separation Agreement dated June 30, 1980. ("Separation Agreement"; a true and correct copy is attached as Exhibit A.)

10. All of the original members of Black Sabbath, Osbourne, Iommi, Butler, and Ward, were parties to that Separation Agreement.

11. Under the explicit terms of the Separation Agreement, Osbourne and his company Monowise, Ltd. ("Monowise") "assign[ed] and transfer[red] . . . any and all rights of any kind or nature that they have or have had in the name 'BLACK SABBATH' . . . . OSBOURNE further agree[d] that he will not hereafter, directly or indirectly, use, permit, or authorize the use of the name 'BLACK SABBATH' or any part of it or any similar name in connection with any activities in and throughout the entertainment industry." (Exh. A ¶ 12.)

9

12. By signing the Separation Agreement, Osbourne also agreed that "[n]o modification, amendment, waiver, termination, or discharge of this Agreement, or any provision hereof, shall be effective unless confirmed by a written instrument signed by the parties to be bound. No waiver of any provision of this Agreement, or any default hereunder, shall effect the waiving party's rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar." (Exh. A at ¶ 18.)

13. By signing the Separation Agreement, Osbourne further agreed that "[i]f any action is brought to enforce the provisions of this Agreement, the prevailing party shall be entitled to costs, including but not limited to reasonable attorneys' fees, in addition to any other relief to which such prevailing party may be entitled." (Exh. A at ¶ 18.)

14. Under the terms of the Separation Agreement, Osbourne received the sum of $50,000 along with 25% in royalties derived from Osbourne's "previous recording and songwriting activities as a member of BLACK SABBATH." (Exh. A ¶ 2.)

15. In 1995, Osbourne signed a settlement agreement that include the Separation Agreement as an attachment, by which he enforced particular provisions of the Separation Agreement. ("1995 Settlement Agreement"; a true and correct copy is attached as Exhibit B.)

**Black Sabbath After Osbourne's Departure**

16. For over twenty-seven years, between 1980 and 2007, Iommi and others continued to perform, tour, record, and/or release albums as Black Sabbath without Osbourne.

17. For over twenty-seven years, between 1980 and 2007, Black Sabbath released at least thirteen studio and live albums, excluding compilations, including "*Heaven and Hell*" (1980), "*Mob Rules*" (1981), "*Live Evil*" (1982), "*Born Again*" (1983), "*Seventh Star*" (1986), "*The Eternal Idol*" (1987), "*Headless Cross*" (1989), "*Tyr*" (1990), "*Dehumanizer*" (1992),

"*Cross Purposes*" (1994), "*Forbidden*" (1995), "*Cross Purposes Live*" (1995), and "*Live at Hammersmith Odeon*" (2007).

18. Osbourne did not perform on any of these thirteen Black Sabbath albums.

19. Of these thirteen Black Sabbath albums:

   a. "*Heaven and Hell*" sold over a million copies in the United States and was certified as platinum in the United States by the Recording Industry Association of America, double platinum in the United Kingdom by the British Phonographic Industry, and gold in Canada by the Canadian Recording Industry Association;

   b. "*Mob Rules*" was certified platinum in the United Kingdom, gold in the United States, and gold in Canada;

   c. "*Headless Cross*" was certified gold in the United Kingdom;

   d. "*Live Evil*" was certified platinum in the United Kingdom; and

   e. "*Dehumanizer*" was certified platinum in the United Kingdom.

20. In or around 2006, in an interview published in Billboard magazine and/or Billboard.com, Osbourne acknowledged that after his departure from the band in 1979 Black Sabbath released "two great albums" with Ronnie James Dio as lead vocalist.

**Iommi's Rights to the Black Sabbath Trademark**

21. The remaining original members of Black Sabbath left the band in 1985.

22. Like Osbourne, at or around the time of his departure, each of the other original band members entered into agreements relinquishing and assigning to Iommi all of his respective right, title, and interest in and to the BLACK SABBATH name.

23. In a signed contract dated October 15, 1985, original band member Butler agreed that he "shall not make any claim in or use the Group Name [Black Sabbath], the Logo, or any trademark, service marks, or other designation substantially similar thereto in any medium or commercial manner whatsoever . . . Butler specifically acknowledges that the rights conveyed to Iommi hereunder in respect of the Group Name and Logo are of a special, unique and intellectual character which gives them peculiar value . . . ." (A true and correct copy of that agreement is attached as Exhibit C.)

24. That same day, original band member Ward also entered into a signed agreement whereby he transferred to Iommi all of his "right[s], title and interest in and to the Name [Black Sabbath] in perpetuity." (A true and correct copy of that agreement is attached as Exhibit D.)

25. Accordingly, by 1985 Iommi had unequivocally obtained sole ownership of and all rights in and to the Black Sabbath name from each of the other three original members of the band.

26. In connection with his long-standing, exclusive, and continuous ownership, control, and use of the Black Sabbath name and the band's image, Iommi registered the mark "Black Sabbath" in a number of jurisdictions.

27. Bluefame Ltd., a company that represented Iommi in a number of business matters, first received approval for registration of the mark in the United Kingdom in 1999. A year later, Bluefame assigned and transferred that registration to Iommi.

28. On October 31, 2000, Iommi successfully registered the name "Black Sabbath" with the United States Patent and Trademark Office. (A true and correct copy of the registration certificate is attached as Exhibit E.)

29. In November 2005, the European Union Office of Harmonization in the Internal Market granted Iommi's application to register the group's name across the European Union.

30. Iommi remains the sole registered owner of the Black Sabbath trademark in every one of these jurisdictions.

31. In or around 2006, in an interview published in Billboard magazine and/or Billboard.com, Osbourne acknowledged that "Tony owns the name Black Sabbath."

**FIRST CLAIM FOR RELIEF**
**(Declaration Judgment Under 28 U.S.C. §§ 2201-02)**

32. Iommi incorporates by reference the allegations contained in paragraphs 1-31 above.

33. An actual controversy has arisen and exists between Osbourne and Iommi within the meaning of 28 U.S.C. § 2201.

34. Osbourne contends that he is part-owner of the BLACK SABBATH mark.

35. In truth and in fact, however, upon his departure from Black Sabbath in 1980, Osbourne executed a binding Separation Agreement whereby he relinquished all of his rights in and to the BLACK SABBATH mark.

36. Iommi is the sole federally registered owner of the BLACK SABBATH mark.

37. Accordingly, Iommi seeks a declaration that Osbourne has no rights to or ownership interest in the BLACK SABBATH mark.

**SECOND CLAIM FOR RELIEF**
**(Declaration Judgment Under 28 U.S.C. §§ 2201-02)**

38. Iommi incorporates by reference the allegations contained in paragraphs 1-37 above.

39. An actual controversy has arisen and exists between Osbourne and Iommi within the meaning of 28 U.S.C. § 2201.

40. Osbourne contends that he is part-owner of the BLACK SABBATH mark.

41. In truth and in fact, however, upon his departure from Black Sabbath in 1980, Osbourne executed a binding Separation Agreement whereby he relinquished all of his rights in and to the BLACK SABBATH mark.

42. Iommi has brought these counterclaims in order to enforce the terms of that Separation Agreement.

43. Under the terms of the Separation Agreement, "if any action is brought to enforce the provisions of this Agreement, the prevailing party shall be entitled to costs, including but not limited to reasonable attorneys' fees, in addition to any other relief to which such prevailing party may be entitled."

44. Accordingly, Iommi seeks a declaration that, to the extent the Court finds that Osbourne has no right to or ownership interest in the BLACK SABBATH mark, Osbourne shall be required to pay the costs and attorney's fee incurred by Iommi in bringing this action to enforce the Separation Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Iommi respectfully requests that the Court:

45. Dismiss Osbourne's claims with prejudice;

46. Declare that Osbourne has no rights or ownership interest in or to the BLACK SABBATH mark;

47. Immediately and permanently restrain and enjoin Osbourne and his agents, representatives, servants and employees, and all persons in active concert and participation with him, from using the BLACK SABBATH mark;

48. Direct Osbourne to pay Iommi the costs of this action and his corresponding attorneys' fees;

49. Award Iommi pre-judgment and post-judgment interest on any monetary award; and

50. Grant Iommi such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Defendant and Counter-Claimant Iommi requests a jury trial on all claims as to which a jury trial may be held.


Dated: New York, New York
March 18, 2010

Respectfully submitted,

DEVORE & DEMARCO LLP

By: /s/ Andrew C. DeVore
Andrew DeVore (AD - 3511)
Amin Kassam (AK - 7860)
99 Park Avenue – 16th Floor
New York, N.Y. 10016
(212) 922-9499

*Attorneys for Defendant Anthony Iommi*